16-134-cv
TCA Television Corp. v. McCollum

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2015

(Argued: June 23, 2016     Decided: October 11, 2016)

Docket No. 16-134-cv

TCA TELEVISION CORP., HI NEIGHBOR, DIANA ABBOTT COLTON,

*Plaintiffs-Appellants,*

—v.—

KEVIN MCCOLLUM, ROBERT ASKINS, DOES, ABC COMPANIES, 1-10, HAND TO GOD LLC, THE ENSEMBLE STUDIO THEATER, INC., MANHATTAN CLASS COMPANY, INC.,

*Defendants-Appellees,*

BROADWAY GLOBAL VENTURES, CMC, MORRIS BERCHARD, MARIANO V. TOLENTINO, JR., STEPHANIE KRAMER, LAMS PRODUCTIONS, INC., DESIMONE WINKLER, JOAN RAFFE, JHETT TOLENTINO, TIMOTHY LACZYNSKI, LILY FAN, AYAL MIODOVNIK, JAM THEATRICALS LTD., KEY BRAND ENTERTAINMENT INC.,

*Defendants.*

1

Before:

JACOBS, CALABRESI, RAGGI, *Circuit Judges.*

On appeal from a judgment entered in the Southern District of New York (Daniels, *J.*) dismissing an action for copyright infringement by the heirs of William "Bud" Abbott and Lou Costello, plaintiffs challenge the district court's determination, made as a matter of law on a Rule 12(b)(6) motion, that defendants' verbatim use of a portion of Abbott and Costello's iconic comedy routine, <u>Who's on First?</u>, in the recent Broadway play <u>Hand to God</u>, qualified as a non-infringing fair use. Defendants defend the district court's fair use ruling, and further argue that dismissal is supported, in any event, by plaintiffs' failure to plead a valid copyright interest. We here conclude that defendants' appropriation of <u>Who's on First?</u> was not a fair use, but, nevertheless, affirm the challenged judgment on defendants' alternative invalidity ground.

AFFIRMED.

> JONATHAN D. REICHMAN (Jonathan W. Thomas, *on the brief*), Kenyon & Kenyon LLP, New York, New York, *for Plaintiffs-Appellants*.
>
> MARK J. LAWLESS, Law Office of Mark J. Lawless, New York, New York, *for Defendants-Appellees*.

2

REENA RAGGI, *Circuit Judge*:

In this action for copyright infringement, plaintiffs, successors-in-interest to the estates of William "Bud" Abbott and Lou Costello, appeal from a judgment of dismissal entered in the United States District Court for the Southern District of New York (George B. Daniels, Jr., *Judge*) in favor of defendants, who include the producers of Hand to God and the play's author, Robert Askins.  See TCA Television Corp. v. McCollum, 151 F. Supp. 3d 419 (S.D.N.Y. 2015).  Plaintiffs assert that the district court erred in concluding from the amended complaint that defendants' use of a portion of the iconic Abbott and Costello comedy routine, Who's on First?, in Act I of Hand to God was so transformative as to establish defendants' fair use defense as a matter of law.  See Fed. R. Civ. P. 12(b)(6).  Defendants here not only defend the district court's fair use determination but also argue that affirmance is warranted, in any event, by plaintiffs' failure to plead a valid copyright interest.  The district court rejected

3

that argument.  See TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 430–31.[1]

For the reasons explained herein, we conclude that defendants' verbatim incorporation of more than a minute of the Who's on First? routine in their commercial production was not a fair use of the material.  Nevertheless, we affirm dismissal because plaintiffs fail plausibly to allege a valid copyright interest.

## I.  Background

The following facts derive from plaintiffs' amended complaint, incorporated exhibits, and documents susceptible to judicial notice.  See Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (acknowledging that, on motion to dismiss, courts may consider documents appended to or incorporated in complaint and matters of which judicial notice may be taken); Island Software &

---

[1] Defendants do not cross-appeal the district court's denial of dismissal on the ground of copyright invalidity; rather, they argue it as an alternative ground for affirmance, even if plaintiffs' fair use challenge prevails.  In this opinion, we first address plaintiffs' challenge to the fair use determination supporting dismissal because if we were to identify no error in that ruling there would be no need to consider defendants' proposed alternative ground for affirmance.

Comput. Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005) (stating that court may take judicial notice of copyright registrations). For purposes of this appeal, we presume these facts to be true. See Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 102 (2d Cir. 2012).

    A.    Abbott and Costello's *Who's on First?* Routine

Abbott and Costello were a popular mid-Twentieth Century comedy duo. One of their routines, commonly referred to as Who's on First? (also, the "Routine"), has become a treasured piece of American entertainment history.[2] The Routine's humor derives from misunderstandings that arise when Abbott announces the roster of a baseball team filled with such oddly named players as "Who," "What," and "I Don't Know." A rapid-fire exchange reveals that "who's on first" need not be a question. It can be a statement of fact, i.e., a player named "Who" is the first baseman. Later parts of the routine reveal, after similar comic misunderstandings, that a player named "What" is the second baseman, and one named "I Don't Know" is the third baseman.

---

[2] In 1999, Time magazine named the Routine the best comedy sketch of the Twentieth Century. See Am. Compl. ¶ 37; Best of the Century, Time, December 31, 1999, at 73.

B.     Agreements Pertaining to Rights in the Routine

The parties cite various contracts and copyright filings spanning more than 40 years as relevant to claimed rights in the Routine.

1.     Abbott and Costello's Agreements with UPC

a.     The July 1940 Agreement

Abbott and Costello first performed Who's on First? in the late 1930s, notably on a 1938 live radio broadcast of The Kate Smith Hour.  The Routine was published for purposes of federal copyright law when Abbott and Costello performed a version of it in their first motion picture, One Night in the Tropics ("Tropics").[3]

The team appeared in Tropics pursuant to a July 24, 1940 contract (the "July Agreement") with Universal Pictures Company, Inc. ("UPC").  The July Agreement guaranteed Abbott and Costello a minimum of five weeks' work at a

_____

[3] Viewing the facts in the light most favorable to plaintiffs, the district court discussed in some detail why (1) before Tropics's release, the Routine was protected by common law copyright; and (2) the movie's release could constitute "publication" of the Routine, extinguishing any common law right and requiring registration and deposit with the federal Copyright Office to claim any statutory copyright protection.  See TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 427–30.

pay rate of $3,500 per week. In turn, Abbott and Costello (the "Artists") agreed

to grant UPC (the "Producer") certain rights and to furnish it with certain items.

We reproduce the relevant text here, adding bracketed signals and highlighting

to distinguish various provisions:

> [1] The Artists expressly give and <u>grant</u> to the Producer the sole and exclusive right to photograph and/or otherwise reproduce any and all of their acts, poses, plays and appearances of any and all kinds during the term hereof, and [2] further agree [a] to <u>furnish</u> to the Producer, without charge to it, the material and routines heretofore used and now owned by the Artists for use by the Producer in the photoplay in which they appear hereunder and for which the Producer shall have the exclusive motion picture rights, and [b] to record their voices and all instrumental, musical and other sound effects produced by them, and [c] to reproduce and/or transmit the same, either separately or in conjunction with such acts, poses, plays and appearances as the Producer may desire, and further [3] give and <u>grant</u> to the Producer solely and exclusively all rights of every kind and character whatsoever in and to the same, or any of them, perpetually, including as well the perpetual right to use the names of the Artists and pictures or other reproductions of the Artists' physical likenesses, and recordations and reproductions of the Artists' voices, in connection with the advertising and exploitation thereof.

J.A. 168–69.

On November 6, 1940, only days before <u>Tropics</u>'s public release, Abbott and Costello entered into a new multi-year/multi-picture agreement with UPC (the "November Agreement").[4]  That contract terminated the July Agreement without prejudice to, among other things, UPC's "ownership . . . of all rights heretofore acquired," including those "in or to any . . . material furnished or supplied by the Artists."  <u>Id.</u> at 162.  In the November Agreement, Abbott and Costello agreed "to furnish and make available to the Producer all literary and dramatic material and routines heretofore used by the Artists either on the radio or otherwise and now owned by the Artists," and acknowledged that "the Producer shall have the right to use said material and routines to such extent as the Producer may desire in connection with any photoplay in which the Artists

---

[4] Plaintiffs' amended complaint cites only the November Agreement with UPC as the relevant contract.  <u>See</u> Am. Compl. ¶ 43.  By the time that agreement was signed, however, Abbott and Costello presumably had already finished their work on <u>Tropics</u>—including any additions to the Routine reflected in that movie.  Thus, it would appear that the team's work on <u>Tropics</u> was pursuant to the July Agreement, discussed <u>supra</u> at I.B.1.a.  The discrepancy does not affect our analysis here because, in the district court, defendants conceded that, at least for purposes of their motion to dismiss, the July Agreement had "in effect, been pleaded" by plaintiffs in support of their claim.  Sept. 9, 2015 Hr'g Tr. 2–3.

render their services hereunder and in connection with the advertising and exploitation of such photoplay." Id. at 129.  Abbott and Costello agreed that they would "not use or license, authorize or permit the use of any of the material and/or routines" so referenced "in connection with motion pictures" by others than UPC for specified times.  Id.  Nevertheless, they reserved the right to use materials and routines created by them (without the assistance of UPC writers) "on the radio and in personal appearances."  Id. at 129–30.

2. UPC Registers a Copyright for *Tropics*

In November 1940, UPC registered a copyright for Tropics with the United States Copyright Office, which it renewed in December 1967.  See id. at 36, 39–40.

3. UPC Uses an Expanded Version of the Routine in *The Naughty Nineties* and Registers a Copyright for that Movie

In 1945, Abbott and Costello performed an expanded version of Who's on First? in another movie for UPC, The Naughty Nineties.  That version maintains the core of the Routine—with "Who" on first base, "What" on second, and "I Don't Know" on third—but several new players take the field: left fielder "Why," center fielder "Because," pitcher "Tomorrow," catcher "Today," and shortstop "I Don't Care."

9

In June 1945, UPC registered a copyright for <u>The Naughty Nineties</u> with the United States Copyright Office, which it renewed in 1972. <u>See</u> <u>id.</u> at 37, 41–42; Am. Compl. ¶ 45.[5]

4. <u>The 1944 Copyright Registration for "Abbott and Costello Baseball Routine"</u>

In April 1944, a work entitled "Abbott and Costello Baseball Routine" was registered with the Copyright Office "in the name of Bud Abbott and Lou Costello, c/o Writers War Board." J.A. 114. The certificate indicates that this "Baseball Routine" was published on "March 13, 1944" in "'<u>Soldier Shows</u>,' No. 19." <u>Id.</u>[6] The record suggests that this registration was not renewed, prompting the Copyright Office to conclude that the work had entered the public domain in

---

[5] By operation of the Sonny Bono Copyright Term Extension Act, Pub. L. No. 105–298, 112 Stat. 2827 (1998), the renewal term for <u>Tropics</u> will not expire until 2035 and that for <u>The Naughty Nineties</u> will not expire until 2040. <u>See</u> 17 U.S.C. § 304(b).

[6] The George Mason University Libraries, in their "Guide to the John C. Becher Soldier Show Collection, 1940-1953," indicates that "Soldier Shows" refers to entertainments "made by soldiers for soldiers," with the object of "mass participation" to raise morale. J.A. 208–09. Because the record here is devoid of any information about either Soldier Shows generally or Soldier Shows, No. 19 in particular, we make no assumptions about the content of the material that is the subject of the 1944 copyright registration.

10

1972, and, on that ground, to reject a 1984 application for a derivative work registration filed by the children of Abbott and Costello based on the 1944 registration.

### 5. The 1984 Quitclaim Agreement

Plaintiffs do not rely on the 1944 registration to support their copyright claim here. Rather, they claim to have succeeded to UPC's copyright interests in the Routine as performed in Tropics and The Naughty Nineties based on a quitclaim agreement dated March 12, 1984 (the "Quitclaim").

In the Quitclaim, which was subsequently recorded with the Copyright Office, UPC's successor-in-interest, Universal Pictures ("Universal"), granted Abbott & Costello Enterprises ("A & C"), a partnership formed by the heirs of Abbott and Costello,[7] "any and all" of Universal's rights, title, and interest in the Routine. Id. at 45. Universal stated that it did so relying upon A & C's representation that it was "a partnership composed of the successors in interest

---

[7] Bud Abbott died in 1974; Lou Costello died in 1959. See Bud Abbott, Straight Man to Lou Costello, Is Dead, N.Y. Times, April 25, 1974, at 42; Lou Costello, 52, Dies on Coast; Comic Had Teamed with Abbott, N.Y. Times, Mar. 4, 1959, at 31.

11

to the late Bud Abbott and Lou Costello" and, therefore, "the owner of copyright in and to the Routine." Id. at 46.

A & C dissolved in 1992, with 50% of its assets transferred to TCA Television Corporation, a California entity owned by Lou Costello's heirs, and the other 50% divided evenly between Bud Abbott's heirs, Vickie Abbott Wheeler and Bud Abbott, Jr. Wheeler would later transfer her 25% interest to a California partnership, Hi Neighbor, and Abbott, Jr. would transfer his 25% interest to Diana Abbott Colton. It is by operation of the Quitclaim and the referenced dissolution and transfer agreements that plaintiffs TCA Television, Hi Neighbor, and Colton now claim a copyright interest in Who's on First?.

C.    *Hand to God*

As described in the amended complaint, Hand to God (the "Play") is "a dark comedy about an introverted student in religious, small-town Texas who finds a creative outlet and a means of communication through a hand puppet, wh[ich] turns into his evil or devilish persona." Am. Compl. ¶ 58. After two successful off-Broadway runs, Hand to God opened to critical acclaim on Broadway in the spring of 2015. Through press coverage, plaintiffs learned that

12

<u>Hand to God</u> incorporated part of the Routine in one of its "key scene[s]," without license or permission. <u>Id.</u> at ¶ 63. While the Play was still in previews for its Broadway opening, plaintiffs sent defendants a cease and desist letter. Defendants' failure to comply with that request prompted this lawsuit.

### 1. The Relevant Scene

Plaintiffs allege that the Play infringes their copyright in the Routine by using its first part—that is, the part pertaining to first baseman "Who"—in Act I, Scene 2. In that scene, which occurs approximately 15 minutes into the Play, the lead character, "Jason," and the girl with whom he is smitten, "Jessica," have just emerged from the basement of their church, where they had been participating in a Christian puppet workshop. Jason tries to impress Jessica by using his sock puppet, "Tyrone," to perform, almost verbatim, a little over a minute of <u>Who's on First?</u>. Jason plays the Bud Abbott role, while Tyrone assumes Lou Costello's character.[8]

---

[8] The Routine is used in the Play as follows:

JASON         . . . . You wanna see something[?]
JESSICA      Ummm.

13

| | |
|---|---|
| JASON | You'll like it. |
| JESSICA | Yeah? |
| JASON | I think you'll like it. |
| JESSICA | Okay. |
| JASON | Okay. |

**Jason slicks back his hair. Takes a deep breath and then says...**

| | |
|---|---|
| JASON | Well Costello, I'm goin' to New York with you. You know Buck Harris the Yankee[s'] manager gave me a job as coach as long as you're on the team. |
| TYRONE | Look Abbott, if you're the coach, you must know all the players. |
| JASON | I certainly do. |
| TYRONE | Well I've never met the guys. So you'll have to tell me their names and then I'll know who's playing on the team. |
| JASON | Oh I'll tell you their names, but you know it seems to me they give these ball players now-a-days very particular names. |

**As he starts he's a little aspergersy. As he goes on he gets more and more comfortable.**

| | |
|---|---|
| TYRONE | You mean funny names? |
| JASON | Well let's see we have on the bags, Who's on first, What's on second, I don't know is on third... |
| TYRONE | That's what I want to find out. |

| | |
|---|---|
| JASON | I say Who's on first, What's on second, I don't know's on third. |
| TYRONE | Are you the manager? |
| JASON | Yes. |
| TYRONE | You gonna be the coach too? |
| JASON | Yes. |
| TYRONE | And you don't know the fellows' names. |
| JASON | Well I should. |
| TYRONE | Then who's on first? |
| JASON | Yes? |
| TYRONE | I mean the fellow's name. |
| JASON | Who. |
| TYRONE | The guy on first. |
| JASON | Who. |
| TYRONE | The first baseman. |
| JASON | Who. |
| TYRONE | The guy playing . . . |

**Jason is really into it.  Jessica is giggling a bit.  But you can imagine him going into it all alone on a Saturday night.**

| | |
|---|---|
| JASON | Who is on first. |
| TYRONE | I'm askin['] you who's on first. |
| JASON | That's the man's name. |
| TYRONE | That's whose name. |
| JASON | Yes. |
| TYRONE | Well go ahead and tell me. |
| JASON | That's it. |
| TYRONE | That's who? |
| JASON | Yes. |

When Jason somewhat bashfully concludes the "Who" part of the Routine, Jessica compliments him by saying, "That's really good," and asks, "Did you come up with that all by yourself[?]"  Suppl. App'x 21.  When Jason answers, "Yes," the audience laughs at what it recognizes as a lie.  Id.; see Am. Compl. ¶ 64.  The answer, however, triggers a different response from the puppet, which, seemingly of its own volition, calls Jason a "Liar," and states that the comic exchange they just performed is "a famous routine from the [F]ifties."  Suppl. App'x 21.  Jason corrects Tyrone, stating that the sketch is from the "Forties."  Id.  Tyrone then insults Jessica, telling her that she would know the Routine's origin if she "weren't so stupid."  Id.  Jason and Jessica each order

> **Jason reaches a pause in the routine and looks out at her.**
> **He becomes aware of what he's doing.**
>
> JESSICA      What are you doing[?] Don't stop.
> JASON        I . . .
>
> **He gets red.**
>
> JESSICA      What?
> JASON        I can't remember anymore.

Suppl. App'x 17–21 (emphases added).

Tyrone to "shut up" to no effect.  Id. at 22.  Instead, as the scene continues, Tyrone vulgarly divulges Jason's physical desire for Jessica.  Only after a seeming physical struggle with Tyrone is Jason able to remove the puppet from his hand and thereby end Tyrone's outburst.  Jason tries to apologize to Jessica, but she quickly exits, leaving Jason—in the words of the stage direction—"[d]efeated by what he ca[]n't defeat."  Id. at 24.

The scene foreshadows darker and more disturbing exchanges between Jason and the puppet that will occur as the Play proceeds.

### 2. Promotional Materials

Plaintiffs allege that, in online promotional materials for the Play, defendants used a "video clip" of Jason and his puppet performing Who's on First? to "stoke interest" in and sell tickets for the Play.  Am. Compl. ¶¶ 69, 89.  These promotional materials are not part of the court record.

### D. District Court Proceedings

On June 4, 2015, plaintiffs filed this action in the Southern District of New York, claiming both federal and common law copyright infringement.  Defendants promptly moved to dismiss, arguing, inter alia, that (1) plaintiffs did

17

not hold a valid copyright; (2) the Routine was in the public domain; and (3) Hand to God's incorporation of the Routine was sufficiently transformative to qualify as a permissible fair use, not prohibited infringement.

On December 17, 2015, the district court granted defendants' motion to dismiss. It declined to do so on either of the first two grounds argued by defendants, concluding that, at the 12(b)(6) stage, plaintiffs had "sufficiently alleged a continuous chain of title" to the Routine to survive dismissal. TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 431. Instead, the court concluded that dismissal was warranted because defendants' use of Who's on First? in Hand to God was "highly transformative" and a non-infringing fair use. Id. at 434, 437.

This appeal followed.

## II. Discussion

### A. Dismissal Was Not Properly Based on Fair Use

#### 1. Standard of Review

We review de novo a judgment of dismissal under Fed. R. Civ. P. 12(b)(6), accepting all factual allegations in the amended complaint and its incorporated

18

exhibits as true and drawing all reasonable inferences in plaintiffs' favor.  See

Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 52 (2d Cir. 2016).  The

challenged dismissal here is based on the district court's determination that

plaintiffs could not succeed on their copyright infringement claim because the

Rule 12(b)(6) record established defendants' fair use defense as a matter of law.

Our review of that decision is necessarily informed by certain basic

copyright principles.  First, the law affords copyright protection to promote not

simply individual interests, but—in the words of the Constitution—"the progress

of science and useful arts" for the benefit of society as a whole.  U.S. Const. art I,

§ 8, cl. 8.  As the Supreme Court has explained, copyright protection is based on

the "economic philosophy . . . that encouragement of individual effort by

personal gain is the best way to advance public welfare."  Mazer v. Stein, 347

U.S. 201, 219 (1954).  In short, the "monopoly created by copyright . . . rewards

the individual author," but only "in order to benefit the public."  Harper & Row

Publishers, Inc. v. Nation Enters., 471 U.S. 539, 546 (1985) (internal quotation

marks omitted); see Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932) ("The sole

19

interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.").

Second, and consistent with this public purpose, the law has long recognized that "some opportunity for fair use of copyrighted materials" is necessary to promote progress in science and art.  Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994); Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos., 621 F.2d 57, 60 (2d Cir. 1980) (stating that fair use doctrine "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster").  The doctrine of fair use, derived from common law, is now codified in the Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541.  See 17 U.S.C. § 107.  That codification does not so much define "fair use" as provide a non-exhaustive list of factors to guide courts' fair use determinations.  This affords the doctrine a certain "malleability" that can challenge judicial application.  4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright (hereinafter "Nimmer") § 13.05, at 13-156 (Matthew Bender, rev. ed., 2016).

Courts most frequently address a proffered fair use defense at summary judgment. See, e.g., Blanch v. Koons, 467 F.3d 244, 250 (2d Cir. 2006) (explaining that court may resolve fair use question at summary judgment if there are no genuine issues of fact); see also Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. at 560 (stating that appeals court may decide fair use where "district court has found facts sufficient to evaluate each of the statutory factors"). Nevertheless, this court has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim. See Cariou v. Prince, 714 F.3d 694, 707 (2d Cir. 2013) (granting defendant partial summary judgment on fair use and citing approvingly to Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687 (7th Cir. 2012) (rejecting argument that fair use could not be decided on motion to dismiss)).

On de novo review here, we conclude that defendants' entitlement to a fair use defense was not so clearly established on the face of the amended complaint and its incorporated exhibits as to support dismissal.

2.      The Statutory Framework for Analyzing Fair Use

In the preamble to 17 U.S.C. § 107, Congress states that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not an infringement of copyright."  As the words "such as" indicate, the listing is "illustrative and not limitative."  17 U.S.C. § 101; see Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. at 561.  Four nonexclusive factors—incorporating common law traditions—are properly considered in "determining whether the use made of a work in any particular case is a fair use."  17 U.S.C. § 107.  These statutory factors are as follows:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

Id.; see generally Folsom v. Marsh, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (Story,

22

J.) (explaining that common law courts "deciding questions of this sort" should "look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work").

In reviewing the challenged determination of fair use in this case, we necessarily discuss these factors individually, at the same time that we heed the Supreme Court's instruction that the factors must be viewed collectively, with their results "weighed together, in light of the purposes of copyright." Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 578.

a.      Purpose and Character of the Use

(1)      Transformative Use

The first statutory fair use factor considers the purpose and character of the secondary use.  In this regard, the uses identified by Congress in the preamble to § 107—criticism, comment, news reporting, teaching, scholarship, and research—might be deemed "most appropriate" for a purpose or character finding indicative of fair use.  Nimmer § 13.05[A][1][a], at 13-162; see Authors Guild v. Google, Inc., 804 F.3d 202, 215 (2d Cir. 2015) (noting that providing

23

commentary or criticism on another's work is "[a]mong the best recognized justifications for copying").

The challenged use here does not appear to fit within any of these statutory categories. Nevertheless, the district court concluded that defendants' use was "transformative," indeed, so "highly transformative" as to be "determinative" of fair use. TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 434–35. The district court explained that by having a single character perform the Routine, the Play's authors were able to contrast "Jason's seemingly soft-spoken personality and the actual outrageousness of his inner nature, which he expresses through the sock puppet." Id. at 436. This contrast was "a darkly comedic critique of the social norms governing a small town in the Bible Belt." Id. This reasoning is flawed in that what it identifies are the general artistic and critical purpose and character of the Play. The district court did not explain how defendants' extensive copying of a famous comedy routine was necessary to this purpose, much less how the character of the Routine was transformed by defendants' use.

The Supreme Court has stated that "the goal of copyright . . . is generally furthered by the creation of transformative works." Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 579.[9] But how does a court decide "whether and to what extent the new work is 'transformative'"? Id. Campbell instructs that a court properly considers "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."

---

[9] The idea that "transformative" purpose could support fair use was put forth by our colleague, Judge Leval, in a seminal article, "Toward a Fair Use Standard." See 103 Harv. L. Rev. 1105, 1111 (1990) ("[T]he question of justification turns primarily on whether, and to what extent, the challenged use is transformative. The use must be productive and must employ the quoted matter in a different manner or for a different purpose from the original. A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test . . . . If, on the other hand, the secondary use adds value to the original—if the quoted matter is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.").

Fair use is not limited to transformative works. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 579. But because the only purpose found by the district court and relied on by defendants is the creation of a transformative work, in analyzing this factor, we necessarily focus on whether a finding of transformative purpose could be made as a matter of law on a Rule 12(b)(6) motion.

Id. (emphases added) (alterations, citations, and internal quotation marks omitted).

As the highlighted language indicates, the focus of inquiry is not simply on the new work, i.e., on whether that work serves a purpose or conveys an overall expression, meaning, or message different from the copyrighted material it appropriates. Rather, the critical inquiry is whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created. See id. Otherwise, any play that needed a character to sing a song, tell a joke, or recite a poem could use unaltered copyrighted material with impunity, so long as the purpose or message of the play was different from that of the appropriated material.

In sum, even if, as the district court concluded, Hand to God is a "darkly comedic critique of the social norms governing a small town in the Bible Belt," TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 436, and even if the Play's purpose and character are completely different from the vaudevillian humor originally animating Who's on First?, that, by itself, does not demonstrate that

26

defendants' use of the Routine in the Play was transformative of the original work.

We made this point in Cariou v. Prince, 714 F.3d 694. There, the defendant, a self-styled "appropriation artist," id. at 699, had taken plaintiff's copyrighted photographs—"serene and deliberately composed" portraits of Rastafarian men—and altered them to create "crude and jarring" collages, id. at 706. Defendant acknowledged that he had not used the photographs to "comment on" the original works. Id. at 707. Instead, both works had an underlying artistic purpose, but defendant stated that he had sought to change the original material "into something that's completely different." Id. (internal quotation marks omitted). Reversing a district court award of summary judgment in favor of plaintiff, this court ruled that, although commentary frequently constitutes fair use, it is not essential that a new creative work comment on an incorporated copyrighted work to be transformative. See id. at 706.[10] Rather, "to qualify as a fair use" in the absence of such a different purpose,

---

[10] Even if such commentary is not essential to fair use, it remains the case, even after Cariou, that commentary or criticism on another's work is "[a]mong the

27

the new work "generally must alter the original with 'new expression, meaning,

or message.'" Id. (quoting Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 579).[11]

_____

best recognized justifications for copying" because such commentary or criticism is in the public interest and frequently requires quoting the copyrighted work to be effective. Authors Guild v. Google, Inc., 804 F.3d at 215; see Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 580–81 (explaining that if new work "has no critical bearing on the substance or style of the original composition . . . the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger"). Hand to God may be a "critique of the social norms governing a small town in the Bible Belt," TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 436, but defendants have not argued that it is a commentary or criticism of Who's on First?. Thus, such transformative purposes do not justify defendants' challenged use here.

[11] In Swatch Group Management Services Ltd. v. Bloomberg L.P., 756 F.3d 73 (2d Cir. 2014), we stated in dictum that "a secondary work can be transformative in function or purpose without altering or actually adding to the original work." Id. at 84 (internal quotation marks omitted). But that statement must be read in context. We were there discussing the fair use of data, not the creation of new artistic work as in Cariou. In the former context, we recognized that "the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." Id. That is not this case. Defendants used a verbatim portion of Who's on First? in Hand to God. The unaltered use of such creative material within another creative work has a weaker claim to fair use protection. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 579; Cariou v. Prince, 714 F.3d at 706; see also Nimmer § 13.05[A][2][a], at 13-187 (recognizing that "scope of fair use is greater when informational type works, as opposed to more creative products[,] are involved" because there is

28

Cariou concluded that the challenged artworks there satisfied this standard because they not only strove for "new aesthetics with creative and communicative results distinct from" that of the copyrighted material, but also gave the incorporated photographs "new expression," thereby admitting a transformative purpose. Id. at 708. Indeed, where the defendant's use so "heavily obscured and altered" the original photographs as to make them "barely recognizable" within the new work, the court ruled that transformative purpose (and ultimately fair use) was established as a matter of law. Id. at 710. But where lesser changes retained certain of the original work's aesthetics, the court could not say "for sure" that their incorporation into the defendant's works had "transformed [the original] work enough to render it transformative." Id. at 711. As to those works, Cariou remanded for further proceedings. Id.

Insofar as Cariou might be thought to represent the high-water mark of our court's recognition of transformative works, it has drawn some criticism. See

---

"greater license to use portions" of "work more of diligence than of originality or inventiveness" (internal quotation marks omitted)). For such an appropriation to be deemed "fair use," the new creative work must either use the copyrighted work for a different purpose or imbue it with a different character, so as to alter the expression, meaning, or message of the original.

29

Kienitz v. Sonnie Nation LLC, 766 F.3d 756, 758 (7th Cir. 2014) (expressing skepticism as to Cariou's approach and criticizing reliance on transformativeness as substitute for the statutory factors, which threatens to override the copyright owner's exclusive right to prepare derivative works); see also Nimmer § 13.05[B][6], at 13.224.20 (stating with respect to Cariou: "It would seem that the pendulum has swung too far in the direction of recognizing any alteration as transformative, such that this doctrine now threatens to swallow fair use. It is respectfully submitted that a correction is needed in the law."). We need not defend Cariou here, however, because our point is that even scrupulous adherence to that decision does not permit defendants' use of Who's on First? in Hand to God to be held transformative.

Far from altering Who's on First? to the point where it is "barely recognizable" within the Play, Cariou v. Prince, 714 F.3d at 710, defendants' use appears not to have altered the Routine at all. The Play may convey a dark critique of society, but it does not transform Abbott and Costello's Routine so that it conveys that message. To the contrary, it appears that the Play specifically has its characters perform Who's on First? without alteration so that the audience

30

will readily recognize both the famous Routine and the boy's false claim to having created it. Indeed, it is only after Who's on First? is performed—at some length, almost verbatim, and with the Play's characters mimicking the original timing, tone, and delivery of Abbott and Costello—that the boy's lie about creating the classic Routine—no part of the Routine—becomes the triggering event for the puppet to assume an independent persona.

Defendants nevertheless maintain that using the Routine for such a "dramatic," rather than comedic, purpose was transformative. Appellees' Br. 18 (stating that Play's use of Routine was "far cry" from original "comedy schtick"). The argument will not bear close scrutiny. The "dramatic" purpose served by the Routine in the Play appears to be as a "McGuffin," that is, as a theatrical device that sets up the plot, but is of little or no significance in itself.[12] To

---

[12] See 3 Oxford English Dictionary Additions Series 285 (1997) (defining "McGuffin" as "particular event, object, factor, etc., which . . . acts as the impetus for the sequence of events depicted, although often proving tangential to the plot it develops"); see also Merriam-Webster's Collegiate Dictionary 744 (11th ed. 2003) (defining "MacGuffin" as "object, event, or character in film or story that serves to set and keep the plot in motion despite usu[ally] lacking intrinsic importance").

advance the plot of the Play, specifically, to have the puppet Tyrone take on a persona distinct from that of Jason, defendants needed Jason to lie about something and for Tyrone to call him on it. But the particular subject of the lie—the Routine—appears irrelevant to that purpose. Such unaltered use of an allegedly copyrighted work, having no bearing on the original work, requires justification to qualify for a fair use defense. See Authors Guild v. Google, Inc., 804 F.3d at 215 (stating that "taking from another author's work for the purpose of making points that have no bearing on the original may well be fair use, but the taker would need to show a justification").

More than the Routine's ability to capture audience attention is necessary to provide such justification. As the Supreme Court has cautioned, where a secondary use "has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention . . . , the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)." Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 580. Nor is a different conclusion warranted because defendants here place the unaltered Routine in a sharply different context from its original authors. See id. at 598

32

(Kennedy, J., concurring) (observing that courts should not afford fair use protection to persons who merely place characters from familiar copyrighted works into novel or eccentric settings).

The fact that, even as a McGuffin, the Routine is quite funny, also cannot justify its use in the Play. That humor is an achievement of the Routine's creators, not of the playwright who takes advantage of it without transforming the Routine's aesthetic. Moreover, the Play appropriates the Routine's humor not incidentally, but extensively by having the characters perform some dozen of the original exchanges on the comic ambiguity of the words "who's on first." No new dramatic purpose was served by so much copying. Cf. Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 589 (concluding that copying of song for parodic purpose was fair where it was not "excessive" in relation to that purpose as secondary user took only what was necessary to evoke original). The only purpose served by the extent of defendants' taking is identically comedic to that of the original authors, that is, to have two performers expand on a singular joke in order to generate increasing audience laughter. As this court has recognized, there is "nothing transformative" about using an original work "in the manner it

33

was made to be" used.  On Davis v. Gap, Inc., 246 F.3d 152, 174 (2d Cir. 2001); see

Ringgold v. Black Entm't Television, Inc., 126 F.3d 70, 79 (2d Cir. 1997)

(concluding that purpose factor favored copyright owner where defendant used

"work for precisely a central purpose for which it was created").  Defendants'

use of the Routine, not briefly as the basis for a dramatic lie, but extensively for

its original comedic effect, cannot be deemed transformative.

In sum, nothing in the 12(b)(6) record shows that the Play imbued the

Routine with any new expression, meaning, or message.  Nor does any new

dramatic purpose justify defendants' extensive copying of the Routine.

Accordingly, the district court erred both in finding defendants' use of the

Routine transformative and in concluding, on that basis, that a fair use defense

was established as a matter of law.[13]

---

[13] We note that even a correct finding of transformative use is not necessarily determinative of the first statutory factor, much less of fair use.  See Authors Guild v. Google Inc., 804 F.3d at 218; Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. at 1111 (recognizing that "existence of . . . transformative objective does not . . . guarantee success in claiming fair use" because "transformative justification must overcome factors favoring the copyright owner").

34

### (2)     Commercial Purpose

The first statutory factor specifically instructs courts to consider whether copyrighted materials are used for a commercial purpose or for a nonprofit educational purpose, the former tending "to weigh against a finding of fair use." Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 585 (internal quotation marks omitted). There is no question here that defendants' use of Who's on First? in Hand to God was for a commercial purpose. Nevertheless, the district court discounted that fact upon finding the use "highly transformative." TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 434–35; see Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 579 (recognizing that "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use"). Because we here conclude that defendants' use was not transformative, let alone "highly transformative," we conclude that the district court erred in discounting Hand to God's commercial character. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 579–81.[14]

---

[14] This court has sometimes assigned little weight to the commercial nature of a secondary use even absent a transformative purpose. See, e.g., Castle Rock

This conclusion applies with particular force here where plaintiffs allege that defendants not only used an unaltered and appreciable excerpt of the Routine in a commercial play but also featured the Routine in the Play's advertising, conduct which reasonably qualifies as commercial exploitation weighing strongly against fair use. See id. at 585 (observing that use of copyrighted work "to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use enquiry than the sale of a parody for its own sake"); American Geophysical Union v. Texaco Inc., 60 F.3d 913, 922 (2d Cir. 1994) (stating that fair use claim will not be sustained when secondary use can fairly be characterized as "commercial exploitation" (internal quotation marks omitted)); Consumers Union of U.S., Inc. v. Gen. Signal Corp., 724 F.2d 1044, 1049 (2d Cir. 1983) (observing that some infringement actions involve copying of creative expression for "purpose of having that precise form

---

Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 142 (2d Cir. 1998). But where, as here, defendants justify their use solely by reference to a transformative purpose, commercialism cannot automatically be discounted absent a finding of such purpose. See Blanch v. Koons, 467 F.3d at 254 (discounting commercial nature of secondary use only because new work was substantially transformative).

36

of expression advance someone else's commercial interests—for example, using well-known copyrighted lines to attract attention to an advertisement"). Indeed, to the extent defendants excessively copied from the Routine even within the Play, their advertising focus on the Routine's comic exchanges raises particular commercial exploitation concerns.

Thus, defendants' commercial use of the Routine was not transformative. Rather, it duplicated to a significant degree the comedic purpose of the original work. As such, the first statutory factor, far from weighing in defendants' favor, weighs in favor of plaintiffs.

### b. Nature of Copyrighted Work

The second statutory factor, "the nature of the copyrighted work," also weighs in plaintiffs' favor. As the Supreme Court has observed, certain "works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 586. Like the district court, we conclude that Who's on First?, an original comedy sketch created for public entertainment, lies at the heart of copyright's intended protection. See id.

37

(recognizing that creative expression created for public dissemination is at core of "copyright's protective purposes"); <u>On Davis v. Gap, Inc.</u>, 246 F.3d at 175 (concluding that second factor favored plaintiff because copyrighted work was "in the nature of an artistic creation"). Thus, while the secondary user of noncreative information can more readily claim fair use based on the law's recognition of "a greater need to disseminate factual works than works of fiction or fantasy," <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. at 563; <u>see</u> <u>Authors Guild v. Google, Inc.</u>, 804 F.3d at 220 & n.21 (explaining that factual works "often present well justified fair uses" because "there is often occasion to test the accuracy of, to rely on, or to repeat their factual propositions," which "may reasonably require quotation"), the secondary user of a creative work must justify his use, usually by explaining the functional or creative rationale behind its quotation, <u>see</u> Pierre N. Leval, <u>Toward a Fair Use Standard</u>, 103 Harv. L. Rev. 1105, 1113 (1990) (explaining that, in considering whether quotation is fair, courts must consider utility of each challenged passage).

Defendants argue that their use was justified by the dramatic need to use an instantly recognizable "cultural" touchstone in the relevant scene. Appellees'

Br. 15. Defendants do not explain, however, why Jason's lie had to pertain to a cultural touchstone, as opposed to any obvious tall tale—e.g., inventing the Internet, traveling to Mars, out-swimming Michael Phelps. See generally Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. at 1111 (observing that court considering fair use must determine not only if justification for copying exists, but also "how powerful, or persuasive, is the justification"). But even assuming defendants' professed dramatic need, they do not explain why the cultural touchstone had to be the Routine—or even a comedy sketch—as opposed to some other readily recognizable exchange, including those already in the public domain. Most troubling, even if defendants could justify their dramatic need to use a small, identifiable segment of the Routine, that does not justify having their characters perform, verbatim, some dozen variations on the Routine's singular joke. As already noted, the purpose of such extensive use was to provoke audience laughter in exactly the same way as the Routine's creators had done.

In sum, because defendants' use of the Routine cannot be deemed transformative, and because the record is devoid of any persuasive justification

39

for the extent of defendants' use, the creative nature of the Routine weighs strongly against a fair use defense.

### c. Amount and Substantiality of Use

The third statutory factor asks whether "'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' . . . are reasonable in relation to the purpose of the copying." Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 586 (quoting 17 U.S.C. § 107(3)). In assessing this factor, we consider not only "the quantity of the materials used" but also "their quality and importance." Id. at 587; see Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. at 565 (stating that "fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression").

While acknowledging that the portion of the Routine used by defendants was "instantly recognizable" and "more than merely the 'introductory premise,'" the district court decided—without explanation—that this factor tipped only "slightly" in plaintiffs' favor in light of defendants' transformative use. TCA

40

Television Corp. v. McCollum, 151 F. Supp. 3d at 434.  We reject the district court's transformative use determination for reasons already explained.  On de novo review, we further conclude that the third statutory factor weighs strongly in favor of plaintiffs.

While the portion of the Routine copied by defendants takes less than two minutes to perform, it plainly reveals the singular joke underlying the entire Routine:  that words understood by one person as a question can be understood by another as an answer.  Moreover, defendants repeatedly exploit that joke through a dozen variations.  This manifests substantial copying.  See Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. at 548, 565–66 (concluding that third factor favored plaintiffs where defendants copied approximately 300 words verbatim in light of "expressive value of the excerpts"); Castle Rock Entm't v. Carol Publ'g Grp., Inc., 955 F. Supp. 260, 269 (S.D.N.Y. 1997) (citing Harper & Row as support for proposition that copying even few words of challenged work can constitute substantial taking if it amounts to taking heart of original work), aff'd, 150 F.3d 132 (2d Cir. 1998).

Even a substantial taking, however, can constitute fair use if justified. <u>See</u> <u>Authors Guild, Inc. v. HathiTrust</u>, 755 F.3d 87, 98 (2d Cir. 2014) (acknowledging that some purposes require copying entirety of copyrighted work); <u>see also</u> Leval, <u>Toward a Fair Use Standard</u>, 103 Harv. L. Rev. at 1123 (explaining that, under third factor, "an important inquiry is whether the selection and quantity of the material taken are reasonable in relation to the purported justification"). But, as already explained, defendants offer no persuasive justification for their extensive use of the Routine. <u>Cf.</u> <u>Authors Guild, Inc. v. HathiTrust</u>, 755 F.3d at 98 (stating that "crux" of third factor inquiry is whether "no more was taken than necessary" (internal quotation marks omitted)).

### d.     <u>Effect on Potential Market for Copyrighted Work</u>

The final statutory factor considers "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), focusing on whether the secondary use usurps demand for the protected work by serving as a market substitute, <u>see</u> <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. at 592 (stating that role of courts is to distinguish between "biting criticism that merely suppresses demand and copyright infringement, which usurps it" (alterations

and internal quotation marks omitted)).  In weighing this factor, a court properly looks to "not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original."  Id. at 590 (alteration and internal quotation marks omitted).

The district court weighed this factor in defendants' favor, concluding that the Play's use of the Routine could not reasonably be expected to usurp the market for Abbott and Costello's original performance.  See TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 434–35.  In so doing, however, the district court disregarded the possibility of defendants' use adversely affecting the licensing market for the Routine.  See id. at 434 (citing Cariou v. Prince, 714 F.3d at 708 (stating that fourth factor "does not focus principally on the question of damage to [a] derivative market")).

While derivative markets are not the principal focus of the fourth inquiry, that does not mean that they are irrelevant.  See Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 593 (recognizing that evidence of substantial harm to derivative

43

market would weigh against fair use). A court considering fair use properly identifies and weighs relevant harm to the derivative market for a copyrighted work, which market includes uses that creators of original works might "license others to develop." Id. at 592; see American Geophysical Union v. Texaco Inc., 60 F.3d at 929 ("[T]he impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor.").

To be clear, in assessing harm posed to a licensing market, a court's focus is not on possible lost licensing fees from defendants' challenged use. See American Geophysical Union v. Texaco Inc., 60 F.3d at 929 n.17 (explaining that fourth factor would always favor copyright owner if courts focused on loss of potential licensing fees from alleged infringer); see also Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. at 1124 ("By definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties."). Rather, a court properly considers the challenged use's "impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." American Geophysical Union v. Texaco Inc., 60 F.3d at 930; accord Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 91 (2d Cir. 2014).

44

Plaintiffs here alleged the existence of a traditional—and active—derivative market for licensing the Routine. See Am. Compl. ¶¶ 40, 81–83 (alleging that plaintiffs receive "regular" requests to license Who's on First?, which they frequently grant). Further, they alleged market harm. See id. at ¶ 83 (alleging that defendants' unlicensed use of Who's on First? negatively affected commercial market for future licensing). Accepting these allegations as true at this stage of the litigation, we conclude that this factor weighs in favor of plaintiffs. See On Davis v. Gap, Inc., 246 F.3d at 175–76 (concluding that fourth factor favored copyright owner where defendants' taking caused both loss of royalty revenue and "diminution of [owner's] opportunity to license to others who might regard [owner's] design as preempted by [defendant's] ad").

In sum, on the 12(b)(6) record, all four statutory factors weigh in favor of plaintiffs and against a defense of fair use. Because, at this stage of the proceeding, defendants have identified no other equitable factors as here relevant to the fair use analysis, we conclude that the dismissal of plaintiffs' amended complaint on the ground of fair use was error. Nevertheless, for reasons explained in the next section of the opinion, we conclude that dismissal

45

was warranted because plaintiffs did not plausibly allege a valid copyright interest in the Routine.

## B. Dismissal for Failure To Plead a Valid Copyright

Defendants argue that, even if we reject dismissal on the basis of a fair use defense, we should affirm because plaintiffs fail plausibly to plead ownership of a valid copyright in the Routine. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991) (identifying two elements of infringement: (1) ownership of valid copyright and (2) copying original elements of work). Defendants assert that Abbott and Costello's Who's on First? Routine fell into the public domain in 1968, when the initial copyright term for Tropics expired. Defendants concede that UPC's registration for that movie protected the Routine—first published therein—from entering the public domain through the term of that copyright, see Shoptalk, Ltd. v. Concorde-New Horizons Corp., 168 F.3d 586, 592 (2d Cir. 1999), but they assert that only Abbott and Costello, as the Routine's authors, could

46

renew the copyright in that work—as distinct from <u>Tropics</u>—which the team failed to do.[15]

In disputing this challenge, plaintiffs argue that UPC had the right to renew the copyright in the Routine because (1) Abbott and Costello assigned ownership of their common law copyright in the Routine to UPC in either the July or November Agreement, (2) the Routine as published in <u>Tropics</u> was a "work for hire" owned by UPC, and (3) the Routine merged into <u>Tropics</u> so as to support a single copyright. Plaintiffs maintain that, under any of these theories, UPC's renewal of the <u>Tropics</u> copyright also maintained copyright protection for the Routine, so that they now hold a valid copyright in that work by virtue of UPC's transfer of its rights in the Routine in the Quitclaim.

We identify no merit in any of the theories relied on by plaintiffs to support their copyright claim and, accordingly, we affirm dismissal of the

---

[15] Because both parties seemingly concede that the Routine was protected from entering the public domain through at least <u>Tropics</u>'s initial copyright term, we need not determine whether <u>Tropics</u>'s publication automatically divested Abbott and Costello of their common law copyright and injected it into the public domain. <u>See</u> <u>Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.</u>, 672 F.2d 1095, 1101–02 (2d Cir. 1982).

47

amended complaint for failure to plead a valid copyright.

### 1. Copyright Assignment

In rejecting defendants' copyright invalidity challenge, the district court thought that "[t]he contract language, together with UPC's subsequent registration of the copyrights" for Tropics and The Naughty Nineties, might admit a finding of "implied assignment of the initial copyright from Abbott and Costello." TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 429; see Nimmer § 10.03[B][2], at 10-56.2(6) (explaining that pre-1978 assignment of common law copyright could be effectuated orally or implied from conduct). The conclusion is flawed in two respects. First, as detailed in this section, the July and November Agreements clearly express the parties' intent for Abbott and Costello to license the use of, not to assign copyrights in, their existing comedy routines for use in UPC movies in which the team appeared. Second, and requiring no further discussion in the face of clear contract language, UPC's registration (and renewal) of copyrights in its movies says nothing about what Abbott and Costello intended to convey in the two agreements because UPC would have taken such action to protect its independent movie rights in any

48

event.  See generally Faulkner v. Nat'l Geographic Soc'y, 220 F. Supp. 2d 237, 239 (S.D.N.Y. 2002) (noting that under 1909 Copyright Act, proprietor of collective work had right to renew copyright in collective work itself).

Turning then to the agreements, we note at the outset that neither contract has a choice of law provision.  Thus, the controlling law would be the contract's "center of gravity," which typically is the place of contracting or performance.  Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997) (internal quotation marks omitted).  The July Agreement was executed in New York with expected performance in California.  The November Agreement was also to be performed in California and may have been executed there, where UPC was located and Abbott and Costello were then completing Tropics.  Any uncertainty on the latter point is irrelevant, however, because New York and California law both instruct that contracts must be interpreted according to the mutual intent of the parties at the time the contract was formed.  See Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629, 825 N.Y.S.2d 692, 695 (2006); AIU Ins. Co. v. Superior Court, 51 Cal. 3d 807, 821, 799 P.2d 1253, 1264 (1990).  Both states recognize that the best evidence of the parties' intent is the

language used in their contract. See Brad H. v. City of New York, 17 N.Y.3d 180, 185, 928 N.Y.S.2d 221, 224 (2011); AIU Ins. Co. v. Superior Court, 51 Cal. 3d at 822, 799 P.2d at 1264. Thus, where contract language is clear and unambiguous, courts will enforce an agreement according to its terms, without looking outside the four corners of the document. See Brad H. v. City of New York, 17 N.Y.3d at 185, 928 N.Y.S.2d at 224; AIU Ins. Co. v. Superior Court, 51 Cal. 3d at 822, 799 P.2d at 1264.

The July Agreement employing Abbott and Costello for "one feature photoplay," J.A. 165, states that the team would furnish UPC with "routines heretofore used and now owned by Artists for use by the Producer in the photoplay in which they appear hereunder and for which the Producer shall have the exclusive motion picture rights," id. at 169 (emphases added). The longer-term November Agreement similarly states that the team would furnish UPC with all "routines heretofore used by the Artists either on the radio or otherwise and now owned by the Artists," and that UPC would "have the right to use said material and routines to such extent as the Producer may desire in connection with any photoplay in which the Artists render their services

50

hereunder." <u>Id.</u> at 129 (emphases added). As the highlighted language in each

agreement makes plain, Abbott and Costello furnished UPC with their routines

for a limited purpose: use in any movies in which the team appeared under the

respective agreements.[16] This is unmistakably the language of an exclusive,

limited-use license, not the assignment of copyright. <u>See</u> Compendium of

Copyright Office Practices § 12.2.1 (1973) (stating that license is "exclusive or

non-exclusive grant of permission to use a copyrighted work for certain

purposes").

A clause in the July Agreement granting UPC "all rights of every kind and

character whatsoever in and to the same . . . perpetually" warrants no different

conclusion. J.A. 169. This language appears in the same sentence as that quoted

in the preceding paragraph and, thus, "all rights . . . in and to the same" can only

be understood to reference UPC's motion picture rights, not the team's common

---

[16] Plaintiffs acknowledged as much in the district court when they argued that the agreements' language "represented a clear grant of rights to UPC in all previous acts and routines created by Abbott and Costello . . . <u>if used in any motion pictures produced by UPC in which Abbott & Costello provided their services</u>." Pls.' Mem. Opp. Mot. Dismiss at 7, <u>TCA Television Corp. v. McCollum</u>, No. 15-cv-4325 (GBD), ECF No. 61 (emphasis added).

law copyright in its routines.[17]  Indeed, in the November Agreement, wherein the team grants UPC the right to photograph and reproduce their "acts," the "perpetual" right "to use the same" is expressly granted "only in connection with the photoplays in which the Artists appear hereunder and in connection with the advertising and exploitation thereof."  Id. at 127.  The November Agreement states that "the Producer shall not have the right to use the Artists' names or likenesses or reproductions of their voices in radio broadcasts (except as hereinafter expressly permitted) independent of . . . motion picture productions or in commercial tie-ups."  Id. at 128.

Other language in the November Agreement further confirms that Abbott and Costello granted UPC only a license to use their routines.  The team therein agreed "that they w[ould] not use or license, authorize or permit the use of any of the material and/or routines" furnished to UPC under the agreement "in connection with motion pictures for any person, firm or corporation other than the Producer, at any time prior to the termination of the employment of the

---

[17] See supra p. 7 (quoting relevant sentence in July Agreement in full).

Artists under this agreement or one year after the general release of the photoplay in which used, whichever is later." Id. at 129. The fact that the Agreement limits Abbott and Costello's ability to use or license specified material (i.e., material created before the agreements) only "in connection with motion pictures," and only for a limited time, plainly indicates the parties' understanding that the team retained ownership of the copyright in their pre-agreement material and granted UPC only a license. See P.C. Films Corp. v. MGM/UA Home Video Inc., 138 F.3d 453, 456 (2d Cir. 1998) (explaining that under 1909 Copyright Act, "transfer of anything less than the totality of rights commanded by copyright was automatically a license rather than an assignment [of] the copyright").

Thus, the language of the July and November Agreements, by itself, clearly belies plaintiffs' claim that Abbott and Costello therein conveyed their common law copyright in the Routine to UPC. That conclusion is reinforced by the very Quitclaim on which plaintiffs' claimed ownership of the Who's on First? copyright depends. To secure the Quitclaim of UPC's interests in the Routine (then held by its successor, Universal), plaintiffs' predecessors-in-interest therein

represented that they owned the copyright in the Routine. In short, the parties to the Quitclaim understood Abbott and Costello not to have transferred, but to have retained, ownership of the Routine's copyright.

Accordingly, plaintiffs cannot state a plausible infringement claim based on a 1940 transfer of copyright ownership from Abbott and Costello to UPC in either the July or November Agreement. The record does not support such assignment.[18]

2. Work Made for Hire

Plaintiffs maintain that, even if the July and November Agreements cannot be construed to have assigned copyrights, they are work-for-hire agreements. They argue that UPC, "[a]s the author under a work-for-hire agreement of the films . . . , properly registered its copyright in these two films with the Copyright Office, and thereafter timely renewed their copyright registrations." Appellants'

---

[18] Because the agreements cannot be construed to effect an assignment of the Routine's copyright to UPC, we need not decide whether they further conveyed the Routine's renewal rights. See Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d 679, 684 (2d Cir. 1993) (recognizing strong presumption against conveyance of renewal rights).

Br. 9; see Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 156–57 (2d Cir. 2003) (explaining that, under 1909 Copyright Act, employer was legal author and, therefore, had renewal rights).

The argument is defeated by plaintiffs' own allegation—which we must accept as true—that the Routine was first performed in March 1938, more than two years before Abbott and Costello entered into the July and November Agreements with UPC. See Am. Compl. ¶ 32. Insofar as Abbott and Costello had already performed Who's on First? in 1938, they plainly did not create the Routine at UPC's "instance and expense" in 1940, as would be required for it to be a work-for-hire. Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995) (stating that work is considered "for hire" when made at hiring party's instance and expense, i.e., "when the motivating factor in producing the work was the employer who induced the creation" (internal quotation marks omitted)); see also Urantia Found. v. Maaherra, 114 F.3d 955, 961 (9th Cir. 1997) ("An employment (or commissioning) relationship at the time the work is created is a condition for claiming renewal as the proprietor of a work made for hire." (internal quotation marks omitted)).

Plaintiffs seek to avoid this conclusion by noting defendants' (1) concession—at least for purposes of their motion to dismiss—that new material was added to the Routine for Tropics, see TCA Television Corp. v. McCollum, 151 F. Supp. 3d at 431; and (2) failure to establish "the contents, language or scope of protectable expression of the 1938 radio broadcast," Appellants' Reply Br. 22. We are not persuaded.

On review of a motion to dismiss, courts must draw all reasonable inferences in plaintiffs' favor. Even applying that principle here, it is not plausible to infer that the Routine, as performed in 1938, did not already contain the initial series of exchanges about a person named "Who" playing first base for the simple reason that there is no Routine without at least that part. Further, because that is the part of the Routine appropriated in Hand to God, plaintiffs must plausibly allege a valid copyright in that material, regardless of later additions. Thus, to the extent plaintiffs' copyright claim rests on a theory of work-for-hire, it was their burden to plead facts showing that the appropriated parts of the Routine had not existed in the 1938 iteration of Who's on First?, but were first created for Tropics so as to be covered by the copyright and copyright

56

renewal of that movie. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. at 361 (stating that to establish infringement claim, plaintiff must demonstrate, among other things, ownership of valid copyright).

3.    Merger of Routine in Motion Pictures

Finally, plaintiffs argue that even if their copyright ownership claim cannot rest on either an assignment or work-for-hire theory, it is plausible because "so much of the Routine as was used in the Movies 'merged' with the Movies to become a 'unitary whole.'" See Appellants' Reply Br. 28. Thus, the Routine was not separately registerable; rather it was protected by UPC's statutory registration and its renewal of the copyrights for movies using the Routine.

This argument also fails because, as this court recently observed, "authors of freestanding works that are incorporated into a film . . . may copyright these 'separate and independent works.'" 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 259 (2d Cir. 2015) (emphasis added) (quoting 17 U.S.C. § 101); see id. at 257 (noting that separate copyrights may be necessary where motion picture incorporates "separate, freestanding pieces that independently constitute 'works

57

of authorship'"). <u>Who's on First?</u> was such a freestanding work within <u>Tropics</u>. As already noted, plaintiffs acknowledged in the amended complaint that the Routine (1) was prepared and existed on its own for some years before it was performed in <u>Tropics</u>, <u>see</u> Am. Compl. ¶ 32; and (2) was performed independently from the films "thousands of times" on the radio and elsewhere, <u>see</u> <u>id.</u> at ¶¶ 34–35; <u>see also</u> J.A. 129 (stating in November Agreement that "Artists reserve the right to use on the radio and in personal appearances" all preexisting routines). The Quitclaim representation that plaintiffs' predecessors-in-interest still owned the Routine's copyright in 1984 is also at odds with the argument that the Routine had so merged with <u>Tropics</u> as to admit a single copyright owned by UPC.

Neither <u>Garcia v. Google, Inc.</u>, 786 F.3d 733 (9th Cir. 2015) (<u>en banc</u>), nor <u>Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.</u>, 531 F.3d 962 (9th Cir. 2008), relied on by plaintiffs, is to the contrary. In <u>Garcia</u>, the Ninth Circuit reversed a panel decision holding that an actor's five-second contribution to a movie was sufficiently creative to entitle her to register a copyright in her performance. The <u>en banc</u> court explained that "[t]reating every acting performance as an

58

independent work" would be a "logistical and financial nightmare." Garcia v.

Google, Inc., 786 F.3d at 743. This case is not analogous. While the screen actor's

performance there was so "integrated into" the filmed work as to be "inseparable

from" it, see 16 Casa Duse, LLC v. Merkin, 791 F.3d at 254, Who's on First? is a

freestanding comedy routine performed by Abbott and Costello not only years

before the first frame of Tropics was ever filmed but also for many years

thereafter. Thus, the concerns at issue in Garcia are not present here.

As for Richlin, the Ninth Circuit did not there hold, as plaintiffs contend,

that an author is "not entitled to an independent copyright by reason of inclusion

of his [story] treatment's material in [a] motion picture." Appellants' Reply Br.

27–28 (emphasis in original). Rather, the court there assumed that plaintiffs'

story treatment was independently copyrightable when it held that plaintiffs had

"failed to secure a federal copyright for it." Richlin v. Metro-Goldwyn-Mayer

Pictures, Inc., 531 F.3d at 976. Thus, the court acknowledged that "publication of

a motion picture with notice secures federal statutory copyright protection for all

of its component parts," but observed "that does not mean that the component

parts necessarily each secure an independent federal statutory copyright." Id. at

59

975–76. The movie's publication protected so much of the treatment as was disclosed therein, but it "did not constitute publication of the Treatment 'as such'—i.e., as a work standing alone." Id. at 973.

This reasoning undermines rather than supports plaintiffs' merger theory. The plaintiffs in Richlin "clearly intended" that the treatment "be merged into inseparable or interdependent parts of a unitary whole." Id. at 967. That is not this case. As already explained, the Routine was created and performed by Abbott and Costello well before Tropics was filmed, and the team continued to perform it for years after. Indeed, the Agreements' licensing of the Routine's performance in Tropics and The Naughty Nineties contemplated such independent performances. In these circumstances, we conclude that the Routine did not merge into UPC's films so as to avoid the need for its creators to renew the copyright. See 16 Casa Duse, LLC v. Merkin, 791 F.3d at 259.

In sum, because plaintiffs fail plausibly to allege that (1) Abbott and Costello assigned their common law copyright in Who's on First? to UPC; (2) the Routine, as appropriated by defendants in Hand to God, was first created for UPC as a work-for-hire; or (3) the Routine so merged with the UPC movies in

60

which it was performed as to become a unitary whole, we conclude that plaintiffs did not plead their possession of a valid copyright in the Routine, as required to pursue their infringement claim.

Accordingly, even though the district court erred in dismissing plaintiffs' amended complaint based on defendants' fair use of the appropriated material, we affirm dismissal based on plaintiffs' failure plausibly to allege a valid copyright.

## III.   Conclusion

To summarize, we conclude as follows:

1.   Dismissal was not supported by fair use because all four relevant factors weigh in plaintiffs' favor:

a.   Defendants' verbatim use of over a minute of Who's on First? in their commercial production, Hand to God, was not transformative because defendants neither used so much of the Routine for a different purpose nor imbued the original with a different message, meaning, or expression;

b.   Defendants failed persuasively to justify their use of the Routine, as a secondary user who appropriates a creative work without

61

alteration must do;

c.     Defendants' use of some dozen of the Routine's variations of "who's on first" was excessive in relation to any dramatic purpose; and

d.     Plaintiffs allege an active secondary market for the work, which was not considered by the district court.

2.     Dismissal is warranted by plaintiffs' failure plausibly to plead ownership of a valid copyright.  Their efforts to do so on theories of assignment, work-for-hire, and merger all fail as a matter of law.

Accordingly, the judgment of dismissal is AFFIRMED.